Good morning. My name is Dawn Reynolds. I represent Michael Bryant, the appellant, the defendant in this case. And I would like to reserve five minutes of my time for rebuttal. I think the primary issue boiled down to whether or not a Franks hearing was deserved. Oh, I'm sorry. It's echoing on me, so I think it's loud. Right. The acoustics in here are very poor. Okay. Sorry. Mr. Franks should have been allowed a Mr. Michael Bryant should have been allowed a Franks hearing based on misleading and false testimony of his probation officer. We admit that given the dirty UA that he submitted on July 29th of 2003, they would have had the right to arrest him and to search his house, his personal property, all of that as per his agreement with the state when he entered into probation. However, the government, the state has argued that he then has this sort of aura of being able, they can search anything that's connected with him, including his mother's home and the subsequent fruits of that. Wait a minute. That's not quite right. I want to make sure, first of all, I'm not mixed up about something. Your brief talked at the beginning of the brief about possession of methamphetamine, and it looked like the indictment was for possession of a firearm by a felon. That was corrected in our reply brief, Your Honor. I inserted the wrong paragraph. Just a different, different brief. Sorry. My next question is, it looked to me as though there was plenty of reasonable suspicion to think that he was violating the terms of his probation. He had consented to a search of where he lived, and there was reasonable suspicion and probably probable cause to think that he lived at his mother's and not at the address that he gave the probation officer. The probation officer. I don't see why anything else matters, frankly. The probation officer misled her supervisor in requesting the permission to search. It's misleading the court that matters, and the affidavit wasn't from the probation supervisor, and it looked fine. Well, if you look at the totality of the circumstances here, in a sense, it's what duty do police and probation authorities? Am I right that she did not write the search warrant affidavit? She had verbal permission to search his, to arrest him, and then she had verbal permission from her, this was all done by telephone, to search his mother's house. She did not write the search warrant. The search warrant was applied for. There were several parties who acted in this. The search warrant was applied for. So even if she's a liar, even if she's a liar, and I'm not saying she was, she didn't write the affidavit, so there's no Frank's issue about the affidavit. But she provided deliberately misleading information. It was almost in concert. Each of these individuals, Officer Ricketts, Officer Richmond, Officer Saunders, Officer Cooper. I didn't see it. Knowledge. I've got the affidavit here, and I didn't see what she provided that was, oh, I see what you're saying. Is confidential informant 03-044 that says he's living at his mother's house, is that the probation officer? Yes. She had no corroborative evidence of that. And this is the same confidential informant who had made this vague assertion that there were four cars at this apartment house that had been abandoned and should be searched. That's so unspecific. Is there something in the file that shows me that one of these two confidential informants that said he's living at his mother's house is the probation officer? No, there's nothing. There's just a CI, and he's given a number. How do you know what it is? It's in the excerpts of records. I believe it's a testimony of Officer Richmond, and that would be, he's the person that applied for the warrant. And that would be around page 86, or excuse me, 123, so forth, of the excerpts of record. If each of these officers only tells a little bit of the story and doesn't bother to corroborate and say, here's the weakness that I have, does this check out with you? Instead, they all took what they had, not admitting that there were any weaknesses to their suspicion that he lived at this residence, and then created this thing out of whole cloth. Now, what was her lie? Pardon me? What was her lie? She did not say that, well, for one thing, she lied first and said she'd been to his house on numerous occasions. Then on cross-examination, she said it had only been three times, that it had always been during business hours. A lie is saying numerous as opposed to three? Well, at first she indicated that it was something like six times, and then she said, well, actually, it was only three that she had logged, and that came out as false. So she didn't say she lied about six. She said she'd logged three. Oh, no, she never said that she lied, but she said that she had logged three incidents. Okay. Is there a better lie? Well, the fact that it's – Frank's also includes the withholding of information. She knew, for example, that he had a job, and she had confirmed that he had a job. It was a day job. Her job was a day shift as well. The only time she had ever been to his house at Magnolia had been during the day. She also neglected to say – tell her supervisor that that home at Magnolia had been searched, and there was evidence that – Did she lie and say she'd been there in the evening? She – what she did was, I think by the omissions that she made, she gave the impression that this man simply was never there, not that it was – I would think any judge would know that. I mean, you couldn't catch any of the three of us at home during the day. Well, this was with her supervisor. Again, her Department of Corrections supervisor, she's getting telephonic approval. She doesn't – she can arrest him because she's got the dirty UA. But what I – what the evidence, the record seems to indicate, is that there was this burning desire to go and search his mother's residence. Now, his mother had lived at that address for nine years. What did the district court say about this? The district court said, well, it's either, as the government says, or they goofed. Because there was evidence that – the court decided to just leap past the Franks issue and go with the idea that Mr. William Bryant had given permission to search his car and that Mr. Bryant – Mr. Michael Bryant, the defendant, was subject to search because of the dirty UA. So there really was no need to get to the issue. Right. Well, let me – let me ask you, because I – going back to what Judge Reinfeld said earlier. He – this was a probationer. Yes. You have no quarrel with the fact that he – that they were entitled to search where he was living? I have no quarrel. No problem there. Okay. Now, the question – he listed his address as being one place. The premises that were searched was a different place. Yes. It was his mother's place. He had originally asked to live at his mother's place, and that was denied because there was – they didn't want him living there. They didn't want him living there, and I think that's important to note. Okay. Now, he was seen several times at the mother's place, or is that the – is that the – is that where you're saying that there was deliberate lying, that he really was living at his place so they didn't – they lied in order to search his mother's? I'm not understanding. Apparently, the confidential informant had stated that Michael Bryant was selling drugs and that he was secreting them in these abandoned – in one of these abandoned vehicles, although he didn't identify which one. The – it's kind of like the toothbrush rule. I mean, when they searched the Magnolia apartment, they found personal effects like toothbrushes, razors, deodorant, the kind of things that you have that I had at my hotel last night. When they searched his mother's house or his girlfriend's bedroom, they found some personal effects, family photographs, and he left his driver's license there, but no toothbrush, no comb, no razor. And, you know, I don't know if you have adult children, but I have four, and we have boxes of furniture from all of these, even though they have jobs in their own residences. It's not uncommon to find personal effects in a parent's home. Well, did the district court make a finding with respect to the probable cause or suspicion or justification to believe that he was living at the mother's house and not at the address that he had listed that he was going to live there? The district court – yes, the court found that they had reasonable suspicion to believe that he lived at Fisk, but, again, had – Is that clearly erroneous? I think it is clearly erroneous. When the request was – under the Franks, if the defendant can show that there were mistruths, misleading statements, and so forth, then he is entitled to a hearing on this. And the court started to go through the process, and then it's almost as though it threw up its hands and said, oh, this is too complicated. We'll just – Is it your position that this gentleman was not living on Fisk Street? It is. Well, what about the evidence that the brother and the defendant's girlfriend pointed to the defendant's room at Fisk Street? But they also – Just stop right there. If a policeman goes up to the house and says, does Mr. Bryant live here? And the brother says, yes. And the girlfriend says, yes, I'm his girlfriend, and that's his room. It's a story on reasonable cause, isn't it? Well, except that both Mr. Bryant and Ms. Fredrickson said that they didn't say that. They were removed from the premises when the police – part of their, you know, the state protectors – Isn't that a conflict in the testimony? Well, it's a conflict. So is the conflict in the testimony that you'd rather believe the policeman rather than the brother and the sister – pardon me – and the girlfriend who might just possibly be on the side of the defendant? That's true, Your Honor. However, if we go back to some of these misleading statements that were made, does that justify those – the only remedy that Mr. Bryant or any defendant in this situation would have is the suppression of evidence. Now, let's go to that. Let's suppose you're right. Suppose that Mr. Bryant, defendant, doesn't live on Fisk Street. And if he's just a social guest there, anything that's found at Fisk Street or the environs, he has no standing to suppress, does he? He has some expectation of privacy, but I think that – In a place where he's only a social guest? Well, this is – they went in on the – This sweep was made based on his residency there, and he wasn't a resident. And they – I mean, if he was, why wasn't there evidence of personal effects such as razors and – You're avoiding the issue. I'm sorry. If, indeed, he is not a resident there and has no real property right to be on the premises, then he's got no standing to protest the Fourth Amendment. He has the right to expect that law enforcement, the government, will not use subterfuge. I don't have that right with respect to his property. Why does he have the right when it's not his property? Isn't there a standing requirement that he have some interest in the property that is seized or in the place that is entered? His – I think what he's asserting is that he has a Fourth Amendment right to be free from unreasonable searches. As to his property. As to his property. But this isn't his property because he's a social guest. And as noted, that he was not charged for drugs that were found there, but it's a but-for situation. But-for, each individual officer involved in this case saying – In other words, they would have to be put on the premises and on omitting other impertinent facts, the police would not have been there that day. And – I'm missing something here. Yes, sir. I'm missing, I guess, the core of the argument. Let me back up first to one little fact that got mixed up on it. Where were the razor and toothbrush, which place? Personal effects, I believe, were found at the Magnolia. I asked you about razor and toothbrush right now. I don't know about other personal effects. Magnolia. What they thought was suspicious was that he didn't have many clothes there. He had work clothes, but then he was a laborer. His girlfriend explained that and that she was underage, couldn't go out to clubs, and she kept his good stuff with her. Okay, let's leave it for now that the probation officer is – let's assume for purposes of argument, she's just real lazy. She knows perfectly well that people that work for a living aren't at home during the day. But she wouldn't want to go before work or after work, so she goes during the day when it's her work hours and he's not there, of course. And so what she says is kind of weak. It still seems to me here's why they would – the police would think he probably lives at his mother's. Number one, somebody told him he did. Number two, it's where he wanted to live. He'd applied for permission to live there. Number three, while there's reason to think that he does live on Magnolia, there's also reason to think that he doesn't. The results of the Magnolia visits, the probation officer interprets them one way, he doesn't live there, but at best for you, they could be interpreted ambiguously. Maybe he lives there, maybe he doesn't. And number four, when the police get there, the brother and girlfriend make responses indicating he lives there. Why isn't that both reasonable suspicion and even more probable cause to believe he lives at his mother's? Because reasonable suspicion has to be based on some objective indicia of truthfulness. I just gave you four. Right. For each of those reasons, the probation officer, CCO Cooper, withheld information that she knew could have gone either way. Well, let's take the first one. When he got out, he wanted permission to live at his mother's and he applied for permission to live at his mother's. I can't see what the lazy or dishonest probation officer in your casting of her has to do with that or how it could be false unless you're saying that your own client misrepresented his desire. Well, you think of the family didn't want him there and there was nothing to indicate that they had changed their minds. I mean, this is a lie. What does that have to do with the P.O. lying or the information being false? Well, because on direct examination, she stated that, well, there were problems and the inference was that it was something that Mr. Bryant had done, whereas on cross-examination, she said, well, no, it's that they didn't want him there. So, you know, again, it's just there are subtle little differences, but when they're used to deceive or mislead in order to create this reasonable suspicion, then what is the defendant's remedy? I'm running out of time. May I? Well, sometimes the defendant doesn't get a remedy because the search is okay and the conviction is okay. Well, if we look at Sampson v. California, this new case that was just decided, I think the Supreme Court has made it clear that probationers on that continuum of rights have more of an expectation of privacy than parolees. It's not as though they lose everything. Right. All right. We may reserve the rest of your time for rebuttal. Good morning. Jill Bolton on behalf of the United States. I think the fundamental issue here is standing. The defendant seems to want to have this both ways. He wants to maintain throughout his argument in front of the district court, as was probably well thought out, that he didn't want to associate him with that residence. And so he maintained continuously throughout the proceedings that he had no association with the residence and that his things were actually at Magnolia. But that really cuts against him because now he's saying that all that evidence that we found and we used against him at trial from that residence, we should have never gotten to it. But what's his standing to contest that search? Let me ask you something about that. I never actually thought about it until this case. But after I grew up and left home, while they were alive, my parents for many years left my room, at least in part, alone. So I'd come back from college or come back from law school and I could stay in my room. They would refer to it as my room. I referred to it as my room. And although it had more and more of their stuff in it, it was understood to be my room. Did I have standing to object to a search of it after I had grown up and gone away to college? I had the same circumstance. And I would say, you know, from a personal perspective, I had a right to control that room. However, the legal standard really is did you have the ability? I had the right to control, obviously, my parents' house. Right, right. And the legal question is do you have the right to refuse others' access? And if you're away at college, how do you have that? So I guess if you're away at jail, it's the same thing. No standing to object to a search of the room because you don't have a right to control access. It's your mother's apartment. If you're away at jail as opposed to college. Yeah. I don't know what the difference would be. I can't think of any. It's do the people that own it. Well, there is for the person who's there. I mean, you don't have standing to object to a search of your room if you're away at college and they think that you and your possessions are still there and you occupy it when you're at the house. And they think that you may be doing something there, don't you? You may not be able to say I don't live there. I have nothing to do with it. Right. Well, and I think that we're talking about hypotheticals. I think it's important to put it in the context of this case. He maintained throughout these proceedings that he didn't live there. Yeah. And ultimately, that's what the district court found. So would your standing be commensurate with I don't live there, I don't control it, I have nothing to do with it? Well, yeah. I mean, isn't it incumbent upon us individually to assert our rights and interests? So you're saying he can't have it both ways. Now, let's just say that he's abandoned, which is what I understood him to have done. His position that he did live there. Well, the problem with that on appeal, I think, is this. The district court found he didn't have standing. And he hasn't challenged that. So how do we review? How do you review that? When a determination has been made by the district court on a legal issue, standing to contest the search, the district court said, I find you don't have standing. And then in the alternative, it ruled, well, even if it's found that you did have standing, here's why the probation office had reasonable suspicion. Do you not have standing? Suppose that a person says, I don't live there. I've never been there. I don't know anything about it. I have nothing to do with it. The judge makes various findings of fact. And the first finding is the defendant was lying about not living there. Actually, that's his home. He lives there. He's there every night, sleeps there, relaxes there in the evening. That was just a lie. That's his home. Can he then go on and make determination two, but he has no standing to object to a search of his home because he took the position that it's not? Well, I think it's a finding of fact the district court makes. In fact, the government argued that he did live there in justification of the search and that there was reasonable suspicion to support the initial probation. So you wanted both ways, too, so I'm not sure. Well, I don't know that I do. So I think that the assertion of standing, once it's been determined by the district court, needs to be contested. And he's not contesting that here. So on appeal, what are you reviewing? Are you reviewing the district court's order? Because that's what I thought we're reviewing is did the district court make a correct determination. And they haven't even addressed it. They've maintained that he didn't even live there. So it seems to me that that argument has really been foreclosed on appeal. Now, there's one other point I would like to make that I think is significant here. We've called him a probationer throughout these proceedings, but and counsel brought to the Court's attention the new case of Sampson v. California that talks about, you know, reasonable suspicion for a probationer and then a lower standard even if you're a parolee. In fact, the defendant was a parolee. If you look at the record. I wanted to ask you that. In this case, and specifically, this is in the supplemental excerpts of record at page 49 through 54. The last page is 54 of that. And that's basically the violation report that the probation office of the state filed with the court to get the arrest warrant to go out to look for him at 811 South 5th that day. In the last paragraph there on page 54, the probation officer, Rene Cooper, the community corrections officer, writes, due to the complexity of this offender, the seriousness of the new charges and the above information, it is recommended that Mr. Bryant's DASA, which is a supervised release or parole, be revoked and he be returned to prison to serve the remainder of his DASA sentence, which is consistent with parole. It's not consistent with probation. So I think that you Can you make a difference? Well, I think it's a lesser standard according to the Supreme Court's latest decision. So in fact, really they could go in and look for him if they didn't even need to have reason to look, a reasonable suspicion to look. If he was a parolee and he was being supervised and seen coming from a residence, which, you know, there was a connection to him to this residence, they can go in and they can look. And that's what this comes down to. It was justified, as the district court found. There were basically three searches. I just want to outline what those were. The first was the probation search, where they just, they saw him coming from the residence, they went in and did a search. And then they went and got a search warrant, because they saw that there was some incriminating evidence in the house. The second part of that is the search of the residence, pursuant to the search warrant. And the district court found that the defendant had no standing to contest that search. And the defendant conceded, I think this is a very important point, that if the probation search, the initial search before the search warrant was valid, that there was probable cause to search the residence. So really, again, at the level of the district court, the defendant waived this argument that there was no probable cause to support the search warrants that she now tries to attack through this purported Franks challenge. The third search was the search of the defendant's brother's vehicle, which was, and that was William Bryant. And he, the district court found that the search warrant that was obtained by the officers to search that vehicle actually was not valid. It was not supported by probable cause. But he did find, the district court judge, that the owner of the vehicle, William Bryant, the registered owner, had consented to the search, and that the consent was not limited, and that the trunk search, which led to the firearm, which was the basis for the prosecution, was valid. It was a key that was found somewhere. It was in his pocket when he was arrested, the defendant's. Again, so that was the link to the car. That was the link to the car, yes. The other issue, really, that was addressed on the appeal by the defendant in this case was his qualifying as an armed career criminal. The only real serious challenge I think that's made here is that the Alford police should not have been relied upon to find this riot conviction a crime of violence. And I think, as I pointed out to the Court in my brief, that the case of the United States v. Guerrero-Velasquez has decided that issue, and that it was valid to rely on that, notwithstanding the fact that there was also three other prior serious drug offenses that the defendant was convicted of. If there are no more questions, I don't have anything else. Thank you. Thank you. First, the DOSA statute with the drug alternative was not, we do not believe that that is the same as being on parole. It was just a program that's offered, but not the same as the typical parolee. The defendant, when the order in the motion denying the motion to suppress, the court did say there still was probable cause to search the FSCA address if there was, if the probation search was invalid. That is not what the defendant argued in his motion and in the supplemental memorandum. And I don't know, you know, the judge said that, but I can find nowhere in the record or in the hearing, the transcript of that suppression hearing where the counsel for the defendant was making that acquisition. I basically knew that they were, it was almost impossible to defend against this if that suppression wasn't allowed. On the issue of the sentencing, I think the other point that we were made is that the crime of riot really was counted against him, gave him two points. And it, under Washington law, it's not considered a crime of violence. It's a Class C felon, it's a gross misdemeanor unless there's some deadly weapon used, and then it's a Class C felony. But under the statute, which crimes of violence under 984, 41.010, those are Class A and Class B felonies. It doesn't carve out any type of sentence for someone committing a Class C felony. So I believe that the offense of riot was misapplied in determining him as an armed career offender. And as well, if you look at his pre-sentence investigation report, there was one incident. He had some drug convictions. They were for mostly small amounts of drugs. And there was one instance in which he had a gun. And there was nothing on the record anywhere that he had ever used a firearm in committing a sale of drugs or had actually used it. And he's now serving time in Atwater, which, as you may know, is one of the reserved for the most dangerous offenders. He's only 30 years old, and it seems an inappropriate sentence. Thank you. Thank you. Case disargued is submitted for decision. That concludes the Court's calendar for this morning, and the Court stands adjourned.
judges: Schroeder, Kleinfeld, Bea